The last case is number 4090608, the re-adoption of A.E.H. For the appellant is Alex Savos? Siavos. Siavos. Okay. And for the appellee is Brian Schroeder? Yes, Your Honor. Okay, Mr. Siavos, you may proceed, sir. Good afternoon, Justice Polk, Justice Steichman, and Justice Appleton. Counsel. May it please the Court, my name is Alex Siavos, and I represent the appellant, Alexandria in this appeal. Alexandria is the biological mother of A.E.H. and is asking the Court to reverse the decision of the Circuit Court in Champaign County and find that her consent to the adoption of A.E.H. by Ralph and Angeles was procured by fraud. The facts of this case. What's our standard review here? The standard review of judges against men classified as the efferents. So we give some deference to Judge Blockley? Yes. The facts of this case, when viewed with a wide-angle perspective, clearly demonstrate that one conclusion is apparent, that Alexandria's consent was procured by fraud. As you mentioned, this is a tough case because it does balance the needs of the state of Illinois and its minor citizens to have a stable and robust process by which adoptions are granted in this state with the needs of the birth mother to raise her child and not be under the influence to give her children up for adoption. The appellant is not that many years into adulthood, relatively undereducated, and was approached by adopting parents 18 months after the birth of her child. Out of the blue, when she was going through a tough time in her life with the departure of the child's father and living alone in Ohio, she is effectively given an offer she can't refuse. Give up her child for adoption while maintaining the bonds of motherhood. Effectively, she is given the envious option of alleviating the financial strains and burdens of childbearing while maintaining the most important maternal bond of them all, contact. Alexandria, unfortunately, believed the adopting parents too much, signed away her legal rights to the child, and put into motion a series of proceedings in her appearance for the first day. Didn't Judge Blackman address these claims and find that your client wasn't as believable as the others? He did, Your Honor. How are we supposed to second-guess that, counsel? I would agree that it's a difficult second-guessing to make, but Judge Blackman's opinion seemed to be a little too narrowly focused on the issue of the promise of a written contract. And I believe it is our position that when viewed in its totality, actually the adopting parents themselves even admit that they made certain types of promises, ambiguous kind of offerings to my client to procure her agreement to consent to the adoption. Counsel, I don't recall any testimony in the record that there was some tie to that statement by the petitioners that they, in order to get her to consent, they were doing this. I didn't see any evidence of that. There wasn't any direct, I guess, quote-unquote statement, you know, give up a kid for adoption and you get to see her, no. But there was an entire kind of framework put in place by the adoptive parents suggesting to Alexandria that if she gives a child up for adoption, she can see her. And, I mean, she was... The judge who took her surrender and her consent in the state of Ohio, was it, or Indiana? Ohio. Ohio. He was very thorough with her on that issue. I would not disagree with that. And I think it's a tough thing to ask an appellate court or even a trial court to disregard a I guess, admonishment. However... On this very issue, because she told that judge in Ohio that it was her understanding she would be able to see this child after the adoption and that that promise had been made. She did. So the trial judge there cleared that up with her, was the way I read it, and said, don't you understand, they can change their mind at any time. I think that's a fair reading. However, my response to that would be, I mean, that's kind of the nature of how this is all playing out here. I mean, she is doing this in a courtroom. I mean, admittedly, it's kind of a scary thing for an unsophisticated party to stand up in front of a judge and be told these things. All the while, in the back of her head, she's got this thought in her head, okay, well, I can just kind of say that, but I really understand what's going on. The adoptive parents are just going to let me see the child. And she was, in effect, kind of going along with it. Just because this is the mindset that she had. I mean, that is... You know, it's not unreasonable that people have and attach more significance to personal and kind of private arrangements between parties than that you, you know, telling a judge in Ohio, yes, I understand that. Well, the problem with that argument, though, counsel, is it seems to me, as someone who is a trial judge and on a few occasions taken these sorts of surrenders, that there should be pretty much nothing I can think of that would be, should be less subject to whim or reversal because of claim reservations than consenting to the adoption of a child, as occurred here, and then letting things proceed accordingly and placing this child with new family and getting the child's life going. You know, we can always say, well, I had my fingers crossed. I didn't think that was going to happen. And these are the kinds of... The legislature has made clear and the courts have made clear that the permanency required of these sorts of proceedings should pretty much trump everything. And I would not disagree with that. However, the legislature did provide the one exception, which is if this consent is procured by fraud. And, you know, she's being told, you know, sign away, sign away your rights, and you can still see the child, but you don't have to worry about her. And, I mean, that is a situation, a scenario, that is contemplated by the legislature when they say... Well, arguably, that might be the case, except, as Justice Pope points out, the judge addressed that specifically. And, secondly, Judge Blackmun said, I don't think that's what happened. I would respectfully disagree. I mean, the transcripts flesh out and the adopting parents, when directly asked, you know, what did you tell Alexandria, they respond, you know, you promised her that she could see her. I mean, these things have real meaning to Alexandria. They're not just kind of platitudes that suggest, well, you know, but that can actually disappear and be reversed at any time once this adoption is through. I mean, when she's told this, she takes it to heart. And, you know, Alexandria was not searching out and seeking out an adoptive family for her child. It came to her. And this kind of demonstrates her mindset in what she's being told. She's being approached with the scenario. You know, do this, this, and this. And you don't have to worry about the well-being of your child, but you can still be in her life. You can still see her. You can still associate with her. And... Well, Fairness Council, my reading of the transcript was the parents were trying to reach her because the child was sick. And they were frustrated. And by the time the adoptive father got a hold of her and was talking to her, he's like, my sense of it was he was telling her, if you're not going to care for this child, why don't you put her up for adoption? And he wasn't suggesting it was him and his wife who had adopted. Your client said, oh, is that something you'd be interested in or something to that effect? Ralph, Ralph and Angela said it to me. That the way I understood the entire kind of genesis of the adoption was that her aunt and uncle, you know, kind of talked with Ralph and Angela, the adoptive parents, and agreed that they would approach Aunt Andrea with the concept of adoption. She comes back and is told about this. It was after this phone call, though, wasn't it? But in this phone call, I don't recall that she initially started off saying, yes, I want to give my child up for adoption. I guess the origin of the idea was not with her. I mean, going back to Judge Blotman's original ruling on the issue, I mean, again, he is primarily focused on the written contract form. And it would be our position that a written contract, you know, it's not always necessary to find fraud in these cases. And given all the communications when viewed in totality, that would rise to a level of fraud where her consent is no longer valid. The, I mean, the last two lines of the appellee's cited case in abundance and are, in my opinion, particularly apt. In cases where parties do not have equal knowledge or means, knowledge of the facts represented, equity will afford relief on the grounds of fraud and misrepresentation. Again, this is a situation where there are two adoptive parents, one of whom is adopted herself, represented by legal counsel, or at least have the means to hire legal counsel, interacting with a party who, you know, she hasn't completed high school. The father of her child has run away and no longer wants to have any dealings with her or his son or his daughter. And there's this completely disequal and unequal bargaining. Not bargaining, just power imbalance, I guess. And this would, to me, is exactly why fraud is so random and readily apparent in this case. I can't, I mean, in my brief, I point out numerous instances where, you know, Ralph and Angela are saying, yes, we can see her. I don't think it's unreasonable that Alexandria relied on these statements. She has, up until the point when things go sour, absolutely no reason to disbelieve them. Okay, that sounds like a good deal. It doesn't seem facially absurd that someone would allow or offer up the chance to interact with their child once he or she's been adopted. And I think that's a reasonable outcome, in this case, in terms of finding a fraudulent, I guess, communication to incentivize her to start to do, to sign the consent. The appellee's contention is that, you know, there was direct testimony that Alexandria was never promised written consent, or written contract, which, as I've discussed, that is not necessarily a fraud. She doesn't have to be promised, and we don't have to demonstrate the existence of a written contract. Just sufficient facts to essentially compromise her ability to properly weigh her options. I mean, there is no, part of the reason that I bring up the idea of, you know, the adoption option came to her, is because up until this point, everything was kind of going along okay. I mean, she was in the process of moving back and forth between Ohio and Illinois. She had to go out to Ohio to secure an appointment, so she left the child. There was nothing at that point that really suggested to her that the child needed to be put up for adoption. Again, it came to her. The appellee also agrees that acts calculated to deceive can rise to the level of fraud. Again, Bundinson cited for the proposition that the defrauding party has some degree of duty to demonstrate However, in this case, Alexander has no reason to view the adopting parent's statements with disbelief. There's nothing, again, as I mentioned, inherently odd about a statement. I mean, from a layperson's perspective, that a biological mother can continue to see her child after an adoption. There is no capacity for my client, the appellant, to avail herself of the truth of representation. Ralph and Angela are the only parties that really possess the information and the capacity to know whether they're going to go ahead with that. Counsel, you have, like, even if they did agree to that, that that was binding for the rest of their lives, no matter how she behaved. I would... They allowed the father to continue to see the child. They were allowing her to see the child. And she missed many opportunities to see the child. And then this turmoil arose. So if they decide it's no longer in the child's best interest for her to see that, what court is going to find that? I wouldn't quibble with the rights of the adoptive parent to direct the child's upbringing after adoption has been granted. As you say, it's perfectly within the rights to grant or limit access to the child or to their biological parents. However, the adoptive parents do not have the right to use that offer as an inducement to procure a consent to adoption. You know, you can't say you can see them sign the adoption and then, you know... What evidence is there in the record to support that they had a nefarious purpose when they made that promise? That they didn't intend to comply with that? What evidence is there of that? There's no direct evidence that, you know... There's no testimony that said, yes, we almost said this to induce and incentivize Alexandria to give up her child for adoption. No, there's no direct evidence of that. However, you know, when read into the facts of the case, that's pretty much the only way this adoption is going to go through. I mean, there's... If Alexandria is told, you know, you can sign this adoption and you may or may not sign this consent and you may or may not see your child, you know, obviously it's something that can't be predicted with any certainty. How about if they said, and I don't think this was actually spoken, but from the turmoil and the facts that have developed, I think it was probably implied, you're welcome to see your child and have contact with your child as long as you're responsible about it and as long as you behave. The responsibility and the behavior went south and that's why the... We're not going to let you see the child anymore because you're damaging, you're harming the child. So what if they had said it that way and the adoption went through and really it was your client that breached the quote-unquote contract, correct? If that was the scenario where they said, you know, do X, Y, and Z, behave and see your child after the adoption is going through, you know, depending on the exact mindset and factual circumstances, I would still submit that that is, to a lesser degree, but still something that is an impermissible kind of inducement to procure the consent to adopt. I mean, my client and, you know, probably most people in her position would not make that distinction. They would not be able to, you know, assess the situation and say, okay, well, these are the conditions that I have to meet in order to... Well, it's not that complicated. Young lady, here's the deal. You've got a baby, you can't afford the baby, you can't take care of the baby, you can't even maintain employment for your own self. We will take your child. We will raise your child. We will, by adoption, we will allow you to see your child, communicate with your child, not be a stranger to your child as long as you behave appropriately. How is that inducement under these circumstances? It's inducement if there is, you know, a recognition there that that's being offered up as what is required in order for her to get her consent. I mean, I would still disagree that that can be done. You can't say, you know, do all of these things, behave, and you can see your child after adoption, even when there's the capacity there for them to, you know, turn that off. No court, as I guess has been indicated, no court would ever uphold any obligation from adoptive parents to allow or to force their adoptive child to see a biological parent. They could have gone the non-private adoption route that the adoptive parents could have and said we've got custody, she left this child with us, called DCFS saying we're happy to take care of the child, we're happy to adopt the child. But you, DCFS, because the child's abandoned, go ahead and file a petition to terminate her parental rights and then we're ready, willing, and able to be right here and you can investigate us and we're all okay. And it's going to take 6 to 12 months longer in terms of the process, but we're going to get to the same place and she's not going to have any rights whatsoever. I don't think the facts of this case, if I'm understanding your question correctly, is something in terms of terminating my client's parental rights because of neglect. I don't believe that's the situation that we're approached with here. I mean, we're basically, you know, sign this paper and you get to see your child. That was the inducement to get her to consent. Thank you, counsel. Mr. Schurter. May it please the court, counsel, my name's Brian Schurter. I'm representing the adoptive parents, Angela and Ralph C. I will likely keep my comments relatively brief as most of my arguments have been expressed in my brief. I would like to point out a few things. As this court has noted, the standard in this case was the decision against the manifest weight of the evidence. I think if this court looks at what is being argued by the appellant in this case, essentially there are no legal issues really being attacked. The only thing that's being attacked is the decision by Judge Blockman, where he has listened to the evidence, he has evaluated all the witnesses, he has determined who was credible, what part of the evidence was credible, and made a decision. And the appellant is essentially coming to this court because they don't like the decision Judge Blockman reached and asking this court to make a new one in its place. I think as has been observed, the issue here is was there a fraud? How we got to the beginning of the adoption, I think Justice Boak, if you look back, your understanding of the record is essentially correct. From my client's perspective, what they testified to was they did the statement by Mr. Ralph C. was that, where have you been? You told us you were going to leave your daughter with us for a week. It's now been two and a half weeks. She's sick. How can we care for her? If you're not going to care for her, why don't you let someone else adopt her? And all of a sudden he gets the response back, well, do you want to? He was completely caught off guard. He had to talk to his wife. This contradicts what the testimony was of the appellant and her aunt and uncle, but as I've observed in the brief, Judge Blockman simply didn't find the aunt and the uncle or the appellant credible on this issue or a number of others. So then what we have to look at is was there a promise of a written contract? First of all, I don't believe there's any testimony that my clients ever said they promised to make a written contract for visitation. It's simply the only individuals who testified to that are the appellant and her aunt and uncle. They're the only ones who know anything about this written contract. There was no discussion of any terms to an alleged contract until at least January, if you look at the testimony. Yet they're asking this court to believe that there was somehow an agreement in place that this was going to occur. Did Judge Blockman address these claims? I'm sorry, which claims? Did Judge Blockman address the claims about this agreement? He addressed that he found that there was no credible evidence to support the belief that there was any sort of promise of a written contract. He specifically addressed that in his order. He addressed it through questioning of both counsel during their closing arguments. And I think what is perhaps most telling in this case and most determinative, even if this court were to accept for a moment that there was this promise of written contract and somehow that that could be considered a false statement made by my clients to induce the appellant. Even if that's the case, to find fraud you have to find that the other party, in this case the appellant, reasonably relied upon that statement. And counsel cites the Arbundanson case in the last two lines, part of which says that if they have the means of knowledge of the facts represented. I cannot imagine a case, while the appellant may have been somewhat uneducated and not quite as experienced, I cannot imagine a case where someone cannot claim or where it would be more difficult to say that they didn't have more access to information. As has been observed, the Ohio judge spent 25 pages worth of testimony going through, explaining her consent, the effect of her consent, giving her the opportunity to ask any questions. Asking her if there were any promises in which she said, well, they said I could see her. Thoroughly explaining that that meant, no, they can change that and this isn't going to change your consent. He absolutely provided her all the information, all the opportunity to ask any question, to find out whether it could be a true or false statement. I simply don't think you can find, even if you were to accept that that statement was made, which we strenuously argue never was, even under the terms of this you can't find that there was fraud because she had more than ample opportunity to register an objection. I guess I would just note that while she says she immediately changed her mind, it wasn't that anything was expressed to any court or my clients until January, nearly two months after she had made this representation, and then suddenly there was claims of fraud and duress and everything else. So with that, I would just, if the court has any questions, be happy to answer them, but do not believe that this court can find that there was any abuse by Judge Blackman in reaching his decision and it certainly was not against the manifest way of the evidence. Thank you, counsel. Mr. Ciavas, any rebuttals, sir? No. Okay. Well, then this court will take the matter under advisement to be in recess until 2 p.m.